IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

LAURA S.,

      Plaintiff,

v.                                CIVIL ACTION NO. 2:22-cv-00272

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

      Defendant.

## PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Laura S. ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and for Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f. (ECF No. 2.) By standing order entered on January 4, 2016, and filed in this case on June 28, 2022, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3.) Presently pending before this Court are Claimant's Brief in Support of Complaint (ECF No. 9), and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 12). In support of these filings, the parties also submitted Claimant's Reply Brief in Support of Complaint (ECF No. 13), and Commissioner's Notice of Supplemental Authority (ECF No. 14) as well as the Commissioner's Second Notice of

Supplemental Authority (ECF No. 15). Accordingly, this matter has been fully briefed and is ripe for adjudication. Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 9), **GRANT** the Commissioner's request to affirm her decision (ECF No. 12), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 48 years old at the time of her amended disability-onset date, and 51 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (Tr. 16, 238, 245.)[1] She has a twelfth-grade education.  (Tr. 273.)  She has worked in the past as a home health aide and as a pharmacy technician.  (*Id*. at 274.)  Claimant alleges that she became disabled on January 1, 2018,[2] due to obsessive-compulsive disorder ("OCD"), possible attention-deficit/hyperactivity disorder ("ADHD"), recurring migraine headaches, chronic kidney stones, a bulging disc of the lumbar spine with degenerative-disc disease, depression and anxiety, stuttering, umbilical and Peterson-space hernias with surgery, complications from gastric-bypass surgery, right-sided tingling and numbness, and trouble sleeping with chronic fatigue. (Tr. 113, 272.)

Claimant filed her application for benefits on June 19, 2019.  (Tr. 231-33, 238-39.) Her claim was initially denied on August 20, 2019, and denied on reconsideration on February 26, 2020. (Tr. 71-77, 96-114.) Thereafter, on April 23, 2020, Claimant filed a

---

[1] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 8.

[2] Claimant initially gave her disability-onset date as January 14, 2019, but subsequently amended the date to January 1, 2018. (Tr. 238, 245.)

written request for hearing. (Tr. 156-58.) An administrative hearing before an ALJ was held telephonically on June 29, 2021. (Tr. 42-64.) On September 20, 2021, the ALJ entered an unfavorable decision. (Tr. 16-34.) Claimant then sought review of the ALJ's decision by the Appeals Council on October 25, 2021. (Tr. 11, 226-27.) The Appeals Council denied Claimant's request for review on April 29, 2022, and the ALJ's decision became the final decision of the Commissioner on that date. (Tr. 8-11.)

Claimant initiated the instant matter on June 27, 2022, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2.) On August 25, 2022, the Commissioner filed an Answer (ECF No. 7) and a transcript of the administrative proceedings (ECF No. 8). This matter having been fully briefed as noted *supra*, it is now ready for resolution.

### B. *Relevant Medical Evidence*

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes the relevant portions[3] herein for the convenience of the United States District Judge.

In May 2019, Claimant reported confusion and numbness and underwent an MRI of the brain. (Tr. 1140.) The results of the MRI were normal. Id. In November 2019, Claimant reported problems with falling and dropping things, though her subsequent physical examination was normal. (Tr. 1170.) Likewise, a neurology note dated November 14, 2019, reflected that Claimant was evaluated for possible multiple sclerosis ("MS") based on her complaints of multiple falls, speech disturbance, weakness, tingling, and

---

[3] Because Claimant's arguments are chiefly grounded in alleged legal error and the majority of the facts are not at issue, only the pertinent portion of Claimant's extensive medical records are summarized.

memory loss. *Id.* Her physician observed that MS was not likely given Claimant's "normal MRI of the brain and her array of symptoms." (Tr. 1415.) MRI results were normal. *Id.*

In December 2019, a neurologist noted that Claimant's "clinical picture was not consistent with MS," and instead the impression was "conversion disorder." (Tr. 1428-1430.) Healthcare providers also found that Claimant's "gait was inconsistent," such that "she had a stable narrow base that fluctuated with occasional crossing; however, she had no stumbling," and while she "walked in a zigzag pattern occasionally," she was nonetheless "able to walk on toes and heels without issues." (Tr. 1422.) Again on January 30, 2020, a neurologist "noted the possibility of hypoglycemic episodes," and advised Claimant that her episodes were likely not seizures. (Tr. 1438.)

Hospital records between May 13, 2020, and May 18, 2020, showed that Claimant reported having a seizure, during which she "was lightheaded and collapsed on the porch," subsequently experiencing "convulsions while waiting in the car for her sister." (Tr. 1469.) Claimant's seizure-like activity was found to have an unclear etiology; her medication was "adjusted," and follow-up with neurology was recommended. *Id.*

On May 20, 2020, Claimant was seen in the emergency room and admitted for further workup after she reported falling three times and laying on the floor because she was unable to get up. (Tr. 1630.) Testing revealed Claimant had "tricyclic anti-depressant (TCA) toxicity at a level of 842 upon admission." *Id.* Neurological examination revealed she was alert and responsive, had intact cranial nerves, and was moving all extremities "equally and fully in a jerky motion." *Id.* Additionally, a seventy-two-hour electroencephalogram ("EEG") did not indicate the presence of any "spells/seizures," leading the neurologist to conclude that the EEG was "suggestive of a nonspecific diffuse encephalopathy." (Tr. 1651, 2268.) On examination, Claimant apparently refused to allow

4

the attending physician to assess whether she walked with a normal gait; however, the physician observed that Claimant was able to follow simple commands and had good knowledge, normal memory, normal motor strength, normal muscle tone, intact sensation, normal coordination, and normal reflexes. *Id*. Claimant was counseled that her prescription medication "can cause dizziness, contributing to risk for falling." (Tr. 2288.) While Claimant was fitted with a "thirty-day event [glucose] monitor" when discharged, the record does not contain any results therefrom. (Tr. 2298.)

When Claimant followed up with neurology in February 2021, she reported having a seizure while shopping at Walmart over the weekend. (Tr. 3046-48.) However, the WVU Hospital's epilepsy-monitoring unit found no indication of seizures, and it was noted that "[t]he WVU epilepsy monitoring unit felt that some of this was somatization." (Tr. 3048.) Subsequent neurological examination of Claimant "revealed findings that included alert and oriented; clear speech; intact finger-nose and rapid tapping; intact reflexes; normal strength; normal gait; and possible slight kinetic tremor at times but no positional tremor, cogwheeling, or rigidity." (Tr. 3046, 3050.)

With respect to her mental-health impairments, the record shows that Claimant received no formal psychological treatment. Claimant's treating physicians documented that she had a normal mental status overall at appointments; additionally, Claimant was treated with medication prescribed by her primary care physician, which provided some relief. (Tr. 370, 419, 735, 737, 899, 918, 925, 943, 1278, 2999 (noting Claimant had no mental health history); Tr. 712 (no altered mental status); Tr. 723, 832, 892, 1317, 1323, 1334, 1347, 1369, 1374, 1382 (mental status examination grossly normal; normal affect and judgment); Tr. 728, 1429, 1437, 1634, 1655, 1658, 2168, 2170, 2176 (oriented times three, normal memory and attention, appropriate knowledge)).

### 1. *Opinion Evidence*

With respect to Claimant's alleged mental-health limitations, licensed psychologist William C. Steinhoff, Jr., M.A., performed a neuropsychological screening on February 17, 2020. (Tr. 1277-1282.) Mr. Steinhoff noted that Claimant's daily routine included watching television, performing light household chores such as washing dishes and cooking, eating a snack, playing games on her phone, talking on the phone, going outside, reading, and spending time with family. *Id.* When asked about her social functioning, Claimant reported shopping and running errands on a weekly basis with either her husband or a friend; additionally, she reported that she "dines out weekly," walks for exercise two-to-three times per week, keeps medical appointments, maintains a checking account, pays bills, and manages her finances. (Tr. 1277-1282.) Claimant reported that she maintained friendships with five close friends. *Id.* Claimant did report, however, that she is no longer able to go to the gym like she used to do. *Id.* Mr. Steinhoff concluded that Claimant's social functioning during the evaluation was "within normal limits" based upon his observations of social interaction with others where Claimant was "cooperative and friendly," maintained normal eye contact and mannerisms, and exhibited a sense of humor and normal appearance. (Tr. 1281.)

Mr. Steinhoff observed that Claimant exhibited straight posture and a normal gait when walking, and that she drove herself to the interview. (Tr. 1277.) Additionally, Mr. Steinhoff noted that Claimant "has never participated in mental health treatment," that she "is not currently receiving any mental health treatment," and that she "has never been hospitalized for mental-health reasons." (Tr. 1278.) She reported that she was last hospitalized for an appendectomy on August 9, 2019. *Id.*

Claimant further reported that she "takes her medication as prescribed," and that she "has experienced one seizure in her lifetime." (Tr. 1278.)

On evaluation, Mr. Steinhoff noted that Claimant did not exhibit any auditory, visual, or motor problems, and "was able to sit throughout the evaluation testing process with no restless behaviors noted." (Tr. 1280.) Claimant "worked at a normal pace," and "demonstrated no frustration after giving incorrect responses and maintained motivation." *Id.* While Claimant was noted to have a depressed mood, restricted affect, and only fair insight, Mr. Steinhoff also observed that she exhibited proper hygiene, coherent and connected speech, understandable and connected thought processes, judgment within normal limits, and normal concentration. (Tr. 1280-81.) Additionally, Mr. Steinhoff noted that Claimant appeared to be appeared oriented to person, time, place, and circumstance, with "no evidence of delusions, paranoia, obsessive thoughts, or compulsive behaviors," and no evidence of "unusual perceptual experiences." *Id.*

With respect to Claimant's memory, Mr. Steinhoff found that Claimant's immediate memory was normal, based on her ability to instantly recall four out of four words. (Tr. 1281.) Likewise, her remote memory was within normal limits based on her ability to recall details of her personal history. *Id.* Mr. Steinhoff did observe that Claimant had an "occasional need for repetition of directions," and he also found that Claimant's recent memory was "severely impaired, based on the Claimant's ability to recall zero out of four words. (Tr. 1280-81.) Additionally, her pace was somewhat slow and her persistence was mildly deficient based on her ability to remain on task. (Tr. 1281.)

Mr. Steinhoff diagnosed an unspecified anxiety disorder, unspecified depressive disorder, and—based upon Claimant's reported history—conversion disorder. *Id.* He noted that Claimant's intellectual abilities "fall in the low average to average range," and opined that Claimant presented with "prominent anxiety symptoms that do not meet the criteria for any one specific anxiety disorder." (Tr. 1278, 1281.) He opined that Claimant appeared capable of managing her own income, keeping scheduled appointments, taking her medication, and performing "all self-care duties independently." (Tr. 1282.)

On June 11, 2021, Claimant's counsel submitted a mental-assessment form completed by Claimant's treating provider, Dr. Dorothy Van Oppen. (Tr. 3042.) Therein, Dr. Van Oppen opined that Claimant had no more than slight impairment in her functional abilities. (Tr. 3043-3044).

With respect to Claimant's physical impairments, consultative examiner Farah Jama, D.O., found that Claimant appeared functionally intact and noted that on examination the claimant was able to lift, carry, and handle light objects and was able to sit, stand, and walk. (Tr. 1268-1276.)

In June 2021, physical therapist Stephen McGeorge performed a functional capacity evaluation of the claimant and noted that she was mainly limited by weakness and pain in bilateral knees. *Id.* Mr. McGeorge noted that Claimant did well with sitting and standing activities, and was "[a]ble to rise from the exam table multiple times without device assistance." (Tr. 1272.) Mr. McGeorge opined that Claimant's physical examination looked good overall, and that Claimant was functional but had some difficulty with knee squats. *Id.* Claimant had slight or no limitation in forward bending-standing, standing work, crouching, kneeling,

climbing stairs, and sitting, but some limitation in performing the six-minute walk test. (Tr. 3268-3289).

### 2. Claimant's Hearing Testimony

At the June 29, 2021 hearing before the ALJ, Claimant testified that in relevant part that her conversion disorder—a psychological disorder that can cause physical limitations—began in October 2018, nine months after her alleged onset date. (Tr. 49.) Claimant testified that she has trouble with memory, major lack of concentration, tremors, slurred speech and stuttering, and her ability to walk "at times" is affected. (Tr. 49.) She has approximately one seizure per month, but she does not know what triggers them. (Tr. 50.) Claimant testified that she sees a neurologist every three months for her conversion disorder and seizures. (Tr. 52.) She has some trouble getting dressed, but does not need help with her daily hygiene because she has a shower chair. (Tr. 53.) She testified that she takes a medication for migraines. (Tr. 54.)

Additionally, Claimant testified that at times she has to lie down or nap during the daytime, that she is fatigued and tired all the time, and that generally she cannot sleep on three nights out of the week. (Tr. 56.) She testified that she is only able to stand for five minutes at one time before needing to sit down, and she has trouble with dizziness, trouble walking, and trouble with balance. (Tr. 51, 57.) Finally, Claimant testified that she is capable of driving and shopping, though she prefers to have her husband drive or otherwise takes someone with her to prevent having an episode while alone. (Tr. 57.)

### 3. Vocational Expert Hearing Testimony

At the hearing, the ALJ employed a vocational expert ("VE") to aid in her determination whether Claimant could perform her past relevant work or other work. (Tr. 57-63.) The ALJ asked the VE to assume that a hypothetical individual who shared the

same age, education, and vocational history as the Claimant, and the following limitations: the individual would be capable of performing work at the light exertional level as defined under the regulations, except the individual could only occasionally climb ramps and stairs, could never climb ladders, ropes or scaffolds, could only occasionally balance, stoop, kneel, crouch and crawl, needed to avoid frequent exposure to extreme cold, heat, and vibrations, and needed to avoid all workplace hazards, such as moving machinery or unprotected heights. (Tr. 59.) The ALJ asked if such a hypothetical individual could perform any of Claimant's past work, either as she actually performed it, or as generally performed. (Tr. 59-60.) In response, the VE testified that such an individual would be capable of performing Claimant's past work as a pharmacy technician, both as actually performed and as generally performed. (Tr. 60.)

The ALJ then modified her first hypothetical by adding the following limitations: the individual could only perform simple, routine, repetitive tasks involving one to two steps; could only manage infrequent changes in the work process or procedures; and required rehearsal or a period of practice as well as occasional reminders in order to master new skills whenever any changes such as new tasks or procedures would occur. (Tr. 60.) In response, the VE testified that a hypothetical individual with these modified limitations would not be capable of working as a pharmacy technician, and would not be able to perform other jobs in the national economy, because "if they had to have occasional reminders to master the skills, they would not be able to complete [a task] on a full-time sustained basis." (Tr. 60-61.)

Next, the ALJ turned back to her first hypothetical, and asked the VE to opine on that individual's ability to work if the exertional level were modified from "light" to "sedentary" as defined in the Agency regulations. (Tr. 61.) In response, the VE testified

that such an individual could perform other work such as an "assembler," "table worker," and "grader sorter." *Id*. The ALJ asked the VE to opine on this hypothetical individual's ability to work if she could perform simple or routine, repetitive, one-to-two-step tasks, in an environment that did not require an assembly line, production-rate pace, or strict production quotas, and was capable of tolerating occasional changes to the work routine, defined as three-to-four changes per work day or a work shift. *Id*. The VE responded that one of the sedentary-level jobs—the table-worker position—would be eliminated, but could be replaced by the position of optical assembler. (Tr. 62.) The VE also testified that an individual who would be absent from work for two or more days per month would not be capable of performing any work in the national economy. *Id*.

Finally, in response to questioning from Claimant's representative, the VE testified that limiting the hypothetical individual to a sedentary range of exertion would preclude the ability to perform any of Claimant's past relevant work. (Tr. 63.)

### C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v.*

*Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step. At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The

claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).    The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862.  "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]."    20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659.  Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria.  20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c).  "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d),

416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180.  If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled."  *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded at the first step that Claimant had not engaged in substantial gainful activity since the alleged-onset date. (Tr. 22.) At step two, the ALJ found that Claimant had the following "severe" impairments: a history of hernia-repair surgery, gastric-bypass surgery, bilateral total-knee-arthroplasty surgery, and psychogenic non-epileptic seizures/conversion disorder, as well as diverticulosis, degenerative-disc disease of the lumbar spine, spondylosis,

migraines, obesity, osteoarthritis, thyroid disorder, and chronic-fatigue syndrome. *Id*. However, at step three, the ALJ found that Claimant's impairments, either alone or in combination, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 25.) Upon assessing Claimant's RFC, the ALJ determined that Claimant is able to perform light work, as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with the following additional limitations: Claimant can perform occasional climbing of ramps and stairs; can never climb ladders, ropes, or scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl; should avoid frequent exposure to extreme cold, heat, and vibration; and should avoid all workplace hazards such as moving machinery or unprotected heights. (Tr. 27.)

At step four, the ALJ concluded that Claimant "is capable of performing past relevant work as a pharmacy technician," reasoning that "[t]his type of work does not require the performance of work-related activities precluded by the claimant's residual functional capacity." (Tr. 33.) As a result, the ALJ concluded that Claimant "has not been under a disability . . . from January 1, 2018, through the date of this decision." *Id*.

## II.    *LEGAL STANDARD*

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)).  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla."  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it

contains 'sufficient evidence' to support the agency's factual determinations." *Id.*
(alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id.*
"In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh
conflicting evidence, make credibility determinations, or substitute [its] judgment for that
of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th
Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled,"
this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.*
(quoting *Craig*, 76 F.3d at 589).

### III.    ANALYSIS

Claimant's arguments are threefold. (ECF No. 9 at 3.) First, Claimant argues that
the ALJ erred when she failed to adopt the mental-health impairments—which the ALJ
had found to be credible—into Claimant's RFC, and also failed to explain her basis for
excluding these impairments from her RFC. *Id.* Second, Claimant argues that the ALJ
made errors of law in evaluating the severity of Claimant's impairment of conversion
disorder. *Id.* Lastly, Claimant argues that remand is required because the ALJ and
Appeals Counsel members were not properly appointed. *Id.*

### A. ALJ's Exclusion of Mental-Health Impairments from Claimant's RFC

Claimant first contends that the ALJ erred by failing to explain the basis for her
exclusion of mental-health impairments from Claimant's RFC. (ECF No. 9 at 3.) Claimant
explained that the ALJ found mild limitations in the four areas of mental functioning, *see*
20 C.F.R. § 404.1520a(c)(4), which Claimant argues should have been analyzed as part of
the RFC determination. (ECF No. 9 at 17.) The Commissioner argues in response that "the
ALJ was entirely clear that [mental-health] limitations were not warranted in the RFC,"

and that substantial evidence supports the ALJ's RFC determination. (ECF No. 12 at 13.) The Court agrees with the Commissioner.

Clearly, an ALJ must consider the combined effects of all the Claimant's medically-determinable impairments when determining Claimant's RFC—not just the "severe" impairments. *Id.* (citing 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2); Social Security Ruling ("SSR") 85-15, 1985 WL 56857.) Prior to determining a claimant's RFC, therefore, the ALJ must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions listed in the regulations." *Lewis v. Berryhill*, 858 F.3d 858, 862 (4th Cir. 2017) (quoting *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015)). Pursuant to this standard, "remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Monroe v. Colvin*, 826 F.3d 176, 188 (4th Cir. 2016) (quoting *Mascio*, 780 F.3d at 636).

However, mental limitations identified using the psychiatric-review technique at issue here "do not necessarily indicate work-related functional limitations that must be present in the RFC assessment." *Wall v. Saul*, 2:20-CV-00460, 2021 WL 5225792, at *8 (S.D. W. Va. June 2, 2021), *adopted*, 2021 WL 5230989 (S.D. W. Va. Nov. 9, 2021). As this Court has previously stated, "[w]hen, as here, an ALJ determines that mental impairments create only a mild limitation, the ALJ is perfectly justified in concluding that no related functional limitation belongs in the RFC finding." *Mosley v. Berryhill*, 2:17-cv-04197, 2018 WL 4781297, at *9 (S.D. W. Va. Sept. 5, 2018), *adopted*, 2018 WL 4781183 (Oct. 3, 2018). *See also Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005) ("Preparing a function-by-function analysis for medical conditions or impairments that

the ALJ found neither credible nor supported by the record is unnecessary."); *see Depover v. Barnhart*, 349 F.3d 563, 567 (8th Cir. 2003) ("[A]ll of the functions that the ALJ specifically addressed in the RFC were those in which he found a limitation, thus giving us some reason to believe that those functions that he omitted were those that were not limited.").

That is precisely what occurred in the matter *sub judice*. The ALJ explained at step two that Claimant's "medically determinable mental impairments of somatic disorder, unspecified depressive disorder, and unspecified anxiety disorder, considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore non-severe." (Tr. 23.) The ALJ's narrative makes clear, therefore, that she concluded the Claimant did not have more than "minimal" work-related limitations due to mental impairments. (Tr. 23-25.)

Claimant argues in her reply brief that "this issue would not be before this Court" if the ALJ had made a finding *at step four* that Claimant's mild mental-health limitations were "minimal" or "negligible" and would not affect her ability to work, and had explained the basis for this finding. (ECF No. 13 at 1.) According to Claimant, "it is the ALJ's failure to explain her decision to omit credible limitations from the RFC that requires remand in this case." *Id.*

However, the ALJ *did* explain at step two why she found that Claimant had no more than "minimal" work-related limitations due to mental impairments, as well as her rationale. Specifically, the ALJ explained that "[a]s to mental allegations," a November 2019 mental-status examination noted Claimant was "fully oriented, appropriately groomed, good eye contact, cooperative, [exhibited] fair attention, [with] normal speech, [and] no psychomotor retardation or agitation, no rigidity or tremors, anxious mood,

appropriate affect, good abstract ability, intact memory, fair insight, and fair judgement." (Tr. 23-24 (citing Tr. 737).) The ALJ further explained that, even though Claimant was diagnosed in December 2019 with generalized anxiety disorder, depression, and somatic symptom disorder (Tr. 727), notes throughout the record consistently revealed the claimant had a good or otherwise appropriate mood. (*See* Tr. 461, 503, 516, 549, 662, 1369, 1474, 1621; 2045, 2050, 2055, 2059, 2065, 2069, 2074, 2079, 2083, 2101.)

Additionally, the ALJ acknowledged that, at a February 2020 psychological evaluation, Claimant was diagnosed with "unspecified anxiety disorder and unspecified depressive disorder." (Tr. 23-24, 32, 1277.) However, the ALJ contrasted these diagnoses with evidence that Claimant did not report any mental health treatment. (Tr. 23.) Additionally, "[m]ental status findings included cooperative, fair eye contact, coherent speech, depressed mood, restricted affect, normal judgment, fair insight, no psychomotor behaviors, normal immediate memory, impaired recent memory, normal remote memory, normal concentration, mildly deficient persistence, somewhat slow pace, and normal social functioning." (Tr. 23 (citing Tr. 1281).) To the ALJ, these diagnoses appeared to be based chiefly on the claimant's self-reported symptoms alone.

Based upon the ALJ's analysis, she concluded that Claimant's "medically determinable mental impairments of somatic disorder, unspecified depressive disorder, and unspecified anxiety disorder, considered singly and in combination, do not cause more than **minimal** limitation in the claimant's ability to perform basic mental work activities and are therefore non-severe." *Id*. (emphasis added). The ALJ explained that her finding was based upon her consideration of "the broad functional areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix

1).ʺ *Id*. She then walked through her analysis under each of the four functional areas of mental functioning. (*See* Tr. 24-25.)

The first functional area is understanding, remembering or applying information.  The ALJ found that Claimant has a mild limitation in this area, based collectively upon the following evidence:

> On the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV), the claimant obtained a full scale IQ of 84,  Cognitive testing revealed severe impairment in memory; however, during consultative evaluation she had normal immediate and remote memory with impaired recent memory as she was unable to recall any of four words after a brief delay (Exhibit 13F).  Additionally, mental status findings in November 2019 revealed the claimant had intact memory.

(Tr. 23-24 (citing Tr. 737, 1277-1290).) The next functional area is interacting with others.  The ALJ found that Claimant has a mild limitation in this area, and explained the evidence that supported her finding. *Id*. For instance, the ALJ explained that Claimant's social functioning was ʺwithin normal limitsʺ during a consultative evaluation.  *Id*. Additionally, Claimant reported going to the store and running errands weekly with her husband or friend, dining out weekly, visiting occasionally with friends or family, and regularly talking on the phone.  (Tr. 24.) Claimant further reported having five close friends and being able to keep medical appointments on her own. (Tr. 24 (citing 1277-1290).) Finally, the ALJ cited a number of records, and stated that they ʺrevealed the claimant was described as cooperative throughout the record.ʺ (Tr. 24.)

The third functional area is concentrating, persisting or maintaining pace. The ALJ found that Claimant has a ʺmild limitationʺ in this area as well, and explained the evidence that supported her finding. (Tr. 24.) For instance, the ALJ highlighted that Claimant's concentration was normal based on a Digit-Span-scaled score of 11 during a consultative evaluation.  *Id*. Additionally, Claimant's persistence was found to be

mildly deficient based on her ability to remain on task, and her pace was somewhat slow. *Id.* The ALJ also highlighted that Claimant reported being able to play games on her phone and read books; further, although Claimant complained of difficulty concentrating at times, "treatment notes reflect findings of normal/intact concentration." (Tr. 24 (citing 737, 1271, 1634).) The ALJ concluded that, "[c]ollectively, the evidence supports no more than mild limitation in this area of functioning." *Id.*

The fourth and final functional area is adapting or managing oneself. The ALJ found that Claimant has a "mild limitation" in this area. *Id.* In support of this finding, the ALJ explained that, during a consultative evaluation, Claimant reported being able to maintain a checking account and pay bills, keep scheduled appointments, take her medications, perform all self-care duties independently, and perform light household chores such as dishes and cooking. (Tr. 24.) Mental status findings revealed she had "fair insight and normal judgment." (Tr. 24 (citing Tr. 1277-1281.) The ALJ also found it significant that Claimant was able to work part-time after the alleged onset date; she found that, collectively, "the evidence supports no more than mild limitation in this area of functioning." (Tr. 24.)

Obviously, this analysis "is not a substitute for the RFC assessment." *Tanner v. Colvin*, 4:15-cv-27-FL, 2016 WL 626493, at *8 (E.D.N.C. Jan. 26, 2016), *adopted*, 2016 WL 617431 (Feb. 16, 2016). However, the Fourth Circuit has stated that an ALJ's failure to perform a function-by-function analysis of Claimant's mental-health impairments *at step four* does not automatically constitute a *per se* basis for remand. *See Ashby* v. Colvin, 2:14-cv-674, 2015 WL 1481625, at *3 (S.D. W. Va. Mar. 31, 2015) (citing *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015)). The Fourth Circuit explained that

"remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Id.* In *Mascio*, for example, remand was proper because the ALJ did not explain how he arrived at his conclusions; he "concluded that Mascio could lift only 20 pounds without explaining his rationale for rejecting a conflicting finding that Mascio could lift 50 pounds." *Id.*

Such is not the case here. At step two, the ALJ explained the basis for her determination that Claimant's work-related mental-health impairments were minimal and therefore irrelevant to the RFC determination. Although "an explicit function-by-function analysis of Claimant's limitations" is preferable, remand is not required where the record, as discussed by the ALJ, provides a significant basis to meaningfully review her conclusions about the Claimant's residual functional capacity. *Geissler v. Berryhill*, 2:16-cv-06590, 2017 WL 3598787, at *6 (S.D.W. Va. July 31, 2017) (quoting *Ashcraft v. Colvin*, 3:13-cv-00417, 2015 WL 9304561, at *7 (W.D.N.C. Dec. 21, 2015), *adopted*, 2017 WL 3599193 (Aug. 21, 2017). The ALJ's opinion does just that—it is detailed and specific enough to demonstrate not only why she did not discuss work-related functional limitations based on mental-health impairments in the RFC assessment at step four, but also the ALJ's rationale and the supporting basis in the record. *See Bryan v. Berryhill*, 1:17-cv-00071, 2018 WL 2324440, at *5 (W.D.N.C. May 22, 2018). The fact that Claimant pointed to conflicting evidence does not warrant reversal; so long as the ALJ demonstrates that her determination is supported by substantial evidence, her decision must be affirmed.

The ALJ's determination is supported by substantial evidence; she assessed only minimal limitations from mental-health impairments at step two, and tethered her

reasoning to substantial record evidence in a detailed analysis. (Tr. 22-25.) Because the ALJ provided a logical bridge between the evidence and her conclusions, her decision does not create the problem identified by the Fourth Circuit in *Mascio* where inadequacies in the ALJ's analysis frustrated meaningful review. the undersigned **FINDS** that remand is unwarranted under the circumstances.

Furthermore, even if the ALJ's RFC determination were insufficient, Claimant has nonetheless failed to demonstrate more than harmless error on the ALJ's part. *See Shinseki v.* Sanders, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination"). Notably, in support of her argument for remand, Claimant pointed to "the purported absence of an explanation." *Morrison v. Berryhill*, No. 1:17-cv-00218, 2018 WL 4440715, at *6 (W.D.N.C. Sept. 17, 2018).  Under the circumstances, further explanation by the ALJ is not required "absent some evidentiary showing by the claimant" that she cannot perform competitive work because of her particular deficits. *Grant v. Colvin*, No. 1:15-cv-00515, 2016 WL 4007606, at *9 (M.D.N.C. July 26, 2016). Claimant has not made that showing here. Accordingly, the undersigned **FINDS** that the ALJ's decision is supported by substantial evidence, and must be affirmed.

### B.  *ALJ's Classification of Claimant's Conversion Disorder as Non-Severe*

Claimant next argued that the ALJ had a duty to explain her evaluation of all of the impairments of record, but failed to understand and properly evaluate Claimant's conversion disorder. (ECF No. 13 at 5.) According to Claimant, the ALJ failed to appreciate that conversion disorder is complex and can cause limitations despite a lack of objective signs. As the Agency regulations acknowledge, "[m]ental impairments are generally considered to be non-exertional, but depression and conversion disorders may

limit exertion." (ECF No. 9 at 9 (citing SSR 85-15, 1985 WL 56857 at * 2).) Because the ALJ found that Claimant's conversion disorder was a severe impairment, Claimant argues that this impairment is "medically determinable" by definition. *Id.* at 10. Claimant concludes that the ALJ's focus on "objective medical findings" despite Claimant's diagnosis of a conversion disorder that the ALJ found to be severe "requires remand for further consideration" of Claimant's subjective complaints and the medical opinions on the record that recognizes the complex nature of Claimant's diagnosis. *Id.*

The Court agrees with the Commissioner that the ALJ did appreciate that conversion disorder can limit exertion, evidenced by her express inclusion of workplace limitations due to conversion disorder. (ECF No. 12 at 24-25.) Specifically, the ALJ found Claimant is able to perform light work, *except* she can perform only occasional climbing of ramps and stairs; never climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; should avoid frequent exposure to extreme cold, heat, and vibration; and should avoid all workplace hazards such as moving machinery or unprotected heights (Tr. 27). The ALJ even then further specified that Claimant "can perform occasional climbing of ramps and stairs; never climbing ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling (**based on** combined impairments, **episodes associated with conversion disorder**, and physical examination findings)"; "and should avoid all workplace hazards such as moving machinery or unprotected heights (based on combination of impairments, physical examination findings, imaging, and associated symptoms)." (Tr. 27-33 (emphasis added).)

The ALJ explained how the medical evidence supported her finding. First, the ALJ noted that an MRI of Claimant's brain was performed in May 2019 due to Claimant's

reports of confusion and numbness. (Tr. 30.) The ALJ found it significant that the MRI was normal. (Tr. 27-33 (citing Tr. 1140).) Additionally, the ALJ noted that in November 2019, Claimant reported problems with falling and dropping things; however, the ALJ noted that Claimant's physical examination was normal. (Tr. 27-33 (citing Tr. 1170).)

Likewise, a neurology note dated November 14, 2019, indicated that Claimant was evaluated when she raised a concern as to whether she had multiple sclerosis ("MS") based on her complaints of multiple falls, speech disturbance, weakness, tingling, and memory loss. (Tr. 27-33.) As the ALJ noted, the physician observed that MS was not likely given Claimant's normal MRI of the brain and her array of symptoms. *Id.* (citing Tr. 1428). Additionally, in December 2019, a neurologist noted that Claimant's clinical picture was not consistent with MS, and instead the impression was conversion disorder. *Id.* (citing Tr. 1428-1430).

The ALJ also found that Claimant's gait was inconsistent, pointing to records indicating Claimant had a stable narrow base that fluctuated with occasional crossing; however, she had no stumbling, and while she had occasional difficulty in directing her steps, she was nonetheless able to walk on toes and heels "without issues." (Tr. 27-33 (citing Tr. 1422).) Again on January 30, 2020, a neurologist noted that Claimant's episodes were likely not seizures; the neurologist instead noted the "possibility of hypoglycemic episodes." (Tr. 30 (citing Tr. 1438).)

Next, the ALJ explained that hospital records between May 13, 2020, and May 18, 2020, showed that Claimant reported having a seizure, during which she was lightheaded and collapsed on the porch, subsequently experiencing convulsions while waiting in the car for her sister." (Tr. 30-31 (citing Tr. 1469).) Claimant's seizure-like activity was found

to have an unclear etiology; her medication was adjusted, and follow-up with neurology was recommended. *Id.*

The ALJ went on to observe that on May 20, 2020, Claimant was seen in the emergency room and admitted for further workup after she reported falling three times and laying on the floor because she was unable to get up. *Id.* Testing revealed Claimant had tricyclic anti-depressant (TCA) toxicity at a level of 842 upon admission. *Id.* Neurological examination revealed she was alert and responsive, had intact cranial nerves, and was moving all extremities equally and fully in a "jerky motion." *Id.* The ALJ found it significant that a seventy-two-hour EEG "did not capture any spells/seizures." (Tr. 30-31 (citing Tr. 1651).) Additionally, Claimant was able to follow simple commands and had good knowledge, normal memory, normal motor strength, normal muscle tone, intact sensation, normal coordination, and normal reflexes, but she refused to allow the attending physician to assess her gait. *Id.* A 30-day even monitor was placed upon discharge, but the ALJ explained that the record does not contain any findings from the monitor. (Tr. 30-32 (citing Tr. 2298).)

Additionally, The ALJ explained that, while a February 2021 neurology note indicated that Claimant reported having a seizure while shopping, she was seen by the WVU epilepsy monitoring unit and no seizures were detected. *Id.* Finally, the ALJ noted that neurological examinations of Claimant revealed findings that included alert and oriented; clear speech; intact finger-nose and rapid tapping; intact reflexes; normal strength; normal gait; and possible slight kinetic tremor at times but no positional tremor, cogwheeling, or rigidity." (Tr. 30-33 (citing Tr. 3046, 3050).)

Claimant is critical of the ALJ's reliance on objective medical findings given the nature of the disorder. (ECF No. 13 at 4.) However, the ALJ also incorporated her findings

with respect to the four areas of mental functioning, which was supported by substantial evidence, including non-medical evidence. The ALJ also noted Claimant's "fairly high functioning activities of daily living that include being able to perform self-care duties independently, go to the store, keep scheduled doctor appointments, do household chores, visit with friends, play games on [her] phone, read books, exercise by walking, and run errands." (Tr. 27.)

In this case, the ALJ's RFC assessment included an appropriate narrative discussion thoroughly describing how the evidence supports each conclusion, and she supported her reasoning with specific citations to the relevant medical facts and nonmedical evidence of record. The ALJ explained her reasons for concluding that Claimant's conversion disorder was not as exertionally limited as claimed. "If the ALJ points to substantial evidence in support of her decision and adequately explains the reasons for her finding on the claimant's credibility, the court must uphold the ALJ's determination." *Brown v. Astrue*, 8:11-cv-03151, 2013 WL 625599, at *17 (D.S.C. Jan. 31, 2013), *adopted*, 2013 WL 625581 (Feb. 20, 2013). Because substantial evidence supports the ALJ's determination that Claimant could perform a reduced range of light work, with further limitations related to her conversion disorder specifically, the ALJ's decision should be affirmed.

### C.  *Legal Validity of ALJ's and Appeals-Council Members' Appointment*

Lastly, Claimant argues that remand is required because "the ALJ and Appeals Council members were not properly appointed" pursuant to federal statute as well as the Appointments Clause of the United States Constitution. (ECF No. 9 at 3.) Claimant emphasized that Ms. Berryhill began serving as Acting Commissioner on January 20, 2017, and was replaced by then-Commissioner Saul on June 17, 2019. (ECF No. 9 at 10-

11.) Claimant argued that Ms. Berryhill's term as Acting Commissioner expired after 210 days pursuant to the Federal Vacancies Reform Act ("FVRA"), 5 U.S.C. § 3346(a), and therefore Ms. Berryhill's appointment of appeals-council and ALJ positions in 2018 are invalid and warrant remand. Id. In support of her argument, Claimant relied on two 2022 opinions from the U.S. District Court for the District of Minnesota: *Brian T. D. v. Kijakazi*, 2022 WL 179540 (D. Minn. Jan. 20, 2022), and *Richard J.M. v. Kijakazi*, 2022 WL 959914 (D. Minn. Mar. 30, 2022).

As the Commissioner explained, however, the Eighth Circuit—in which the District of Minnesota sits—expressly rejected the approach taken by the District of Michigan in *Dahle v. Kijakazi*, 62 F.4th 424, 426 (8th Cir. 2023), explaining that the FVRA permits an acting official to serve during the pendency of a first or second nomination even when that nomination was submitted after the initial 210-day period for acting service has expired. *Dahle*, 62 F.4th at 429-430. The Eighth Circuit held, therefore, that Ms. Berryhill was validly serving as Acting Commissioner when she ratified the appointments of Administrative Law Judges for the Agency and approved them as her own. *See id.* The authority from the District of Minnesota on which Claimant based her FVRA argument therefore no longer supports her position.

Moreover, the Fourth Circuit has now ruled on the issue. On April 11, 2023, the United States Court of Appeals for the Fourth Circuit published *Rush v. Kijakazi*, 65 F.4th 114, 118-124 (4th Cir. 2023), setting forth controlling precedent in favor of the Commissioner's position. In *Rush*, the Fourth Circuit joined the United States Court of Appeals for the Eighth Circuit in holding that the FVRA permits an acting official to serve during the pendency of a first or second nomination even when that nomination was submitted after the initial 210-day period for acting service has expired. *See id.* The

Fourth Circuit held, therefore, that Nancy Berryhill was validly serving as Acting Commissioner when she ratified the appointments of Administrative Law Judges for the Agency and approved them as her own. *See id.* Given this controlling precedent, the undersigned **FINDS** that Claimant's FVRA claim fails as a matter of law.

### IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 9), **GRANT** the Commissioner's request to affirm her decision (ECF No. 12), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable John T. Copenhaver, Jr., Senior United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection.  Extension of this time period may be granted for good cause shown.  Copies of any objections shall be served on opposing parties and provided to Judge Copenhaver.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals.  28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: August 31, 2023

Dwane L. Tinsley
United States Magistrate Judge